### Cooper Estate

*Paul Maloney, Pepper, Hamilton & Scheetz*, for appellant.

*Herbert W. Salus, Jr.*, Special Assistant Attorney General, for Commonwealth.

KLEIN, Adm. J., January 15, 1970.—This is an appeal from the assessment of inheritance taxes filed by the executors of the Estate of John McGill Cooper. He was born on November 24, 1882, and died at the age of 84 years on December 22, 1966. His aunt, Mary E. McGill, died at the age of 93 years on September 7, 1965. She named him as one of her executors and left him two-fifteenths of her estate, which, together with his commissions as coexecutor, was approximately $300,000, of which he received $9,600 on account on December 23, 1965, and $130,000 on November 18, 1966. The balance of his share, which amounted to $156,766.30 was paid after his death to his personal representatives.

The initial payment of $9,600 received by decedent was delivered to Fidelity-Philadelphia Trust Company (now The Fidelity Bank), the trustee designated in an irrevocable deed of trust which he created on December 20, 1965. The trust provides that the income is to be paid to settlor's son, John McGill Cooper, Jr., and his wife, Lydia Brooks Cooper, for their lives, and upon the death of the survivor of them, the principal is to be paid to the issue. $100,000 of the payment of $130,000 received by decedent on November 18, 1966, was immediately added to the trust corpus. He died a month later.

In 1940, John McGill Cooper established a savings account in Philadelphia in his name as trustee for his grandson, John McGill Cooper, 3rd. In 1943, he opened a similar account as trustee for his granddaughter, Elizabeth Jane Cooper. Each account had $2,371.90 on deposit at the time of settlor's death on December 22, 1966.

An inheritance tax assessment was filed on July 5, 1968, which included in the taxable estate the payment· of $100,000 to the trustees named in the deed

of trust of December 20, 1965, and the two savings accounts in the total amount of $4,743.80.

The Fidelity Bank, as coexecutor, filed an inheritance tax protest objecting to the inclusion of the amount of $104,743.80 in the taxable estate. On November 25, 1968, the Inheritance Tax Protest Board of the Pennsylvania Department of Revenue denied the protest and ruled that the items were taxable for inheritance tax purposes as being made in contemplation of death. An appeal was then taken to this court.

In its petition, The Fidelity Bank alleged, in paragraph 13, that ". . . the dominant or impelling motive of John McGill Cooper in making said gifts was not the contemplation of death but rather his desire to confer immediate benefits upon his son and daughter-in-law and grandchildren, and to provide for the corporate management and investment of the funds. . . ."

A responsive answer was filed by the Commonwealth challenging the averments of the petition.

## THE SAVINGS ACCOUNTS

Apparently, the appeal with respect to these items has been abandoned as no testimony was offered with respect thereto and no mention is made of them in the briefs of counsel.

In our opinion, the funds in the accounts are subject to tax under section 226 of the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373. A savings bank deposit by a person of his own money, in his own name, as trustee for another, standing alone, creates merely a tentative trust, revocable at will, until the depositor dies or completes the gift in his lifetime: Rodgers Estate, 374 Pa. 246 (1953); Brose Estate, 416 Pa. 386 (1965). Clear and convincing

evidence must be produced to establish that a tentative trust has been made irrevocable in the lifetime of the creator of the trust: Ingels Estate, 372 Pa. 171 (1952). No such evidence was produced in the present case. Absent such evidence, the fact that the passbooks were in the possession of John McGill Cooper when he died makes the fund subject to inheritance tax.

## THE TRANSFER TO THE TRUST

John McGill Cooper devoted the last years of his life in the service of his aged aunt, who was partially blind, quite deaf and very rich. He served her seven days a week as confidential agent, secretary and general factotum and had little time to enjoy life on his own. The pay he received from her was exceedingly modest, first $300 a month, and then ultimately $450 a month. However, he was apparently chained to her by affection and the expectancy of a large inheritance, which, unfortunately, came too late for him to truly enjoy. His great desire was to travel. He could not do much of this while his aunt was alive and he wanted to make the most of his new gotten freedom when she passed on.

Mr. Ernest Scott, who is one of the ablest and most respected members of our bar, was counsel for decedent and his aunt. He testified:

". . . He [John McGill Cooper] had said that his own assets were really sufficient for his own needs, and he did not need beyond that, that the McGill interest represented money which was not necessary for his living expenses on the scale to which he was accustomed and that his son and his son's family could use the money. He said that his son was having some difficulties in connection with his business. I did not know the son. I did not know what business he was in. I did not inquire about it, but this was the basis of my suggestion that all or part of the interest in the Mc-

Gill Estate should go over into this irrevocable trust , . . ."

Mr. Scott testified further:

"Let me say this about the man. When I first met him in 1955, he was 70, and I thought he was in his early 50's. I did not find out differently until we got the ages of himself and his wife when we went into the estate planning operations some time in the summer of 1955. He was a tall, lean, erect man and a very vital person. He certainly did not look anything like his age. He walked with a real swing. He showed a vitality of mind and body which was quite extraordinary. In all the 15 years that I saw him, I don't ever remember his being late for an appointment. I never remember him breaking an appointment. I never remember him complaining about feeling poorly, and I am sure he did not look poorly. He just was one of those people who remained young. . . ."

Thomas G. Crosson, who owns a chauffeur-limousine service business, was decedent's friend and companion. He drove for him and accompanied him on his travels. He testified:

"Q. Did you know anything about his future plans? Did he ever discuss his future plans?

"A. Well, he wanted to take that North Cape cruise in July, 1967. They couldn't take out accommodations. They got accommodations for June or July, 1968, which was 19 or 20 months after his demise. Then when he got back from that, we were going to go either that fall or the following spring to the Canadian Rockies. I did not know my availability that fall, which would have been the fall of 1968, but I said, 'I am positive I can make accommodations for myself or, at least, make myself available—myself and my wife—for the spring of 1969'.

"He said, 'Well, fine, because we have plenty of time to make reservations for Banff and the stampede

at Calgary or whatever it may be in the Canadian Rockies.' "

The Inheritance and Estate Tax Act of 1961 provides:

"Section 222. CONTEMPLATION OF DEATH.—A transfer conforming to Section 221(a), and made in contemplation of the death of the transferor, is subject to tax under this Act. A transfer shall not be deemed or held to have been made in contemplation of death if made more than two (2) years prior to the death of the transferor, but, unless shown to the contrary, shall be deemed to have been in contemplation of death if it is of a material part of the transferor's estate and is made within two (2) years prior to the death of the transferor.

"A transfer is made in contemplation of death when the dominant or impelling motive, but not necessarily the sole motive of the transferor, was prompted by the thought of death, without which motive the transfer would not have been made. The term is not restricted to that expectancy of imminent death which actuates the mind of a person making a gift causa mortis."

The comment to this section states that the definition of a transfer made in contemplation of death is suggested by United States v. Wells, 283 U. S. 102, and Estate of Johnson, 10 T.C. 680. It is also in accord with the Pennsylvania decisions. Wanamaker Estate, 8 D. & C. 569 (1924), involved the estate of John Wanamaker, the wealthy merchant prince, who died in 1922, at the age of 84. About two years before his death, he gave his interest in the John Wanamaker Philadelphia company, valued at about $30,000,000, to his son, as a gift. Although Mr. Wanamaker was active in business, he suffered from an enlarged prostate gland and was compelled constantly to use a catheter, which his physician would remove

every four or five days, in order to wash out his bladder and insert a clean catheter. Our illustrious predecessor, Judge John Marshall Gest, in a scholarly opinion, held that the transfer was not taxable as a gift made in contemplation of death. He said, at page 573:

" 'It is very clear that this contemplation of death is not the general knowledge of all men that all men must die, or the general expectation of every man that his life, like that of all others, must sooner or later terminate. . . . Such a general contemplation of death may often influence one's acts and purposes, but when we are dealing with a transfer or gift of property "in contemplation of death," we mean, first, that death is contemplated . . . as an event that is, in the circumstances, definitely imminent in the near future; and, second, that this contemplation of death exists as the impelling motive. . . .' "

It is extremely difficult to reconcile the many decided cases in this State with respect to the taxability of gifts alleged to have been made in contemplation of death. Each situation is sui generis and depends upon its own framework of facts: Eshelman Estate, 371 Pa. 400 (1952).

In Grossman and Smith, Pennsylvania Inheritance and Estate Tax, the leading authority on the subject, the following analysis of cases in which the transfers were held not to have been made in contemplation of death is found, at page 102:

| "Age of Transferor | "Time elapsed between transfer and death | "Transferor's health |
|---|---|---|
| "Paroz Est., 8 Fiduc. Rep. 558 (O.C. Lanc. 1958) 69 | 40 days | . . . |

"Eshelman Est., 8
Fiduc. Rep. 593
(O.C. Lanc. 1958) 74      2 months       . . .
"Frailey Est., 48
Lanc. 59 (1942)   82      4 months       good
"Camp Est., 4
Beaver 47 (1942)  87      series during   good
5 years
"Sourber Est., 64
York 115 (1950)   86      5 months       good
"Goodlin Est., 54
Lanc. 363 (1955)  77      6 months       good
"See also Slaughenhaup Est., 1 Adams 181 (O.C. Frank. 1960); Fogelsanger Est., 10 D. & C. 2d 578 (O. C. Frank. 1957); Laub Est., 48 Luz. 25 (1957); Baker Est., 39 D. & C. 405 (O.C. Colum. 1940); Smith Est., 77 D. & C. 574 (O.C. Lanc. 1951)."

We could, however, readily list as many cases in which the gifts were held to be taxable as in contemplation of death. For a few examples see Oldfield Estate, 19 Fiduc. Rep. 147 (1969); Wentzel Estate, 60 Berks 73 (1968); Miller Estate, 8 Adams 31 (1966).

One of the circumstances which makes this case unique is the fact that decedent was a devout Christian Scientist, having himself been a Christian Science practitioner. As such, he not only did not receive medical attention from physicians but his religious beliefs negated the idea of bodily illness. Christian Science believers regard illness as an illusion and are usually blessed with cheerful views regarding life and death.

A study of the record in this case leads us to the conclusion that John McGill Cooper's course of conduct and way of life suggests that he had an optimistic belief in the extended continuation of his life rather than a frame of mind which contemplated its termination in the near future.

"The cases make it quite clear that the transferor's advanced age, standing alone, is a relatively minor factor, and that poor health or motives associated with death generally will have to concur with advanced age to result in taxability of the transfers": Grossman and Smith, supra, page 101.

What is controlling is decedent's frame of mind. If he thinks he is well, it does not matter that he is actually ill. Mr. Cooper was apparently in the best of health and certainly did not regard himself as a sick man. He was erect, walked a great deal and looked and acted much younger than his years. He attended to his business affairs, wrote with a firm clear hand and lived a full social life. He had a Christmas dinner celebration with Mr. Crosson and his wife the very night he died of a sudden heart attack. Certainly, his planning for extended travel tours for as far ahead as 1969 is wholly inconsistent with the expectation of an early death.

The gift of $100,000 to the trust represents about 15 percent of decedent's total gross estate as shown by the Inheritance Tax Division's appraisement of $662,731.91. Although the amount of the gift is substantial, we do not regard it necessarily as such a material part of transferor's estate, as to make it taxable under the circumstances of this case. His own assets were in excess of $350,000 when he inherited approximately $300,000 from his aunt. His income was more than ample for his own needs. According to Mr. Scott's testimony, "his son was having some difficulties in connection with his business" and "he and his family could use the money." We, therefore, are of the opinion that the gift in question was made for the specific purpose of easing the financial problems of his only child rather than in contemplation of death.

Moreover, the gift in question was made pursuant to the continuation of a plan of giving which was initiated on December 20, 1965, when he deposited the

$9,600 with the trustee. This was slightly more than one year prior to his death on December 22, 1966. In such case, the earlier date is to be taken into consideration in determining whether the last gift was made in contemplation of death. See Dehon Estate, 1 Fiduc. Rep. 278 (1951); Roberts' Estate, 56 York 83 (1942). Although the larger payment was also made within the two-year statutory period when a gift is deemed to have been made in contemplation of death, it fortifies the executor's contention that the gift is not subject to the tax because of the lengthened period between the time of the creation of the trust and the date of settlor's death.

Accordingly, we rule that appellant has met the burden which has been placed upon it by the statute and conclude that the gift of $100,000 made on November 18, 1966, was not made in contemplation of death and, hence, is not subject to inheritance tax.

We, therefore, enter the following

### DECREE

And now, January 15, 1970, the appeal from the inheritance tax appraisement in the Estate of John McGill Cooper, deceased: (1) Is dismissed with respect to the assessment of tax on $4,743.80, in the two saving fund accounts; and (2) is sustained with respect to the assessment of tax on $100,000 paid to The Fidelity Bank, trustee under deed of trust dated December 20, 1965.